UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LANCE LOWELL LEWIS, | ) | Civil Action No. 2:22-cv-3403-DCN-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This action arises out of Plaintiff's employment with Defendant.  Plaintiff alleges that Defendant discriminated against him because of his age and retaliated against him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq.  Presently before the Court is Defendant's Motion for Summary Judgment (ECF No. 47).  Plaintiff filed a Response (ECF No. 50), and Defendant filed a Reply (ECF No. 51).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. 636(b)(1)(A) and (B) and Local Rule 73.02 (B)(2)(g), DSC.  This report and recommendation is entered for review by the district judge.

## II.     FACTS

Plaintiff started working at Boeing on September 21, 2012, when he was sixty-one years old.  Pl. Dep. 69-70 (ECF 47-2) ("I was, kind of, old when they hired me.").  Plaintiff started as a Composite Fabricator A and Boeing later promoted him to Composite Fabricator B. Pl. Dep. 72-73.  On January 29, 2021, Plaintiff transferred from Boeing's primary facility to a different location called the Interior Responsibility Center (the IRC). Pl. Dep. 48, 75-76. Plaintiff remained a

Composite Fabricator B at the IRC and was assigned to a section called Crew Rest Fabrication, which is responsible for putting inserts in fabricated panels. Pl. Dep. 13; Lee Dep. 10 (ECF No. 47-3). Prior to his transfer to the IRC , Plaintiff had never filed an EEOC complaint or a hostile work environment complaint. Pl. Aff. Dated April 10, 2023 (ECF No. 50-1). He had twelve different supervisors prior to transferring to the IRC, and received met expectations or exceeds expectations evaluations from all twelve supervisors during that time. Pl. Dep. Ex. pp. 74-124 (ECF No. 50-6).

For his first two weeks at the IRC, from January 29, 2021, to February 12, 2021, Plaintiff received training, which included an instructor-led course on IRC Inserts. Pl. Dep. 144-46; Plaintiff's Education and Training Report (ECF No. 47-4). Plaintiff failed his insert training because he did not finish the inserts on both sides of the test panel in the standard allotted time. Pl. Dep. 147-48. As a result, Plaintiff had to retake the IRC Insert training course on February 17, 2021, before starting work on the production floor. Pl. Dep. 148-49. During training, Plaintiff met his direct supervisor, Cameron Lee, for the first time. Pl. Dep. 153-54. Lee managed five different areas within the IRC, including a team of employees who worked on inserts. Lee Dep. 9-10; Pl. Dep. 139. The insert team included Plaintiff, Team Lead Mike Dubis, and three other employees named Jack Lamb, Glenda Gunderson, and Bernardino "Deano" Pomer.[1] Pl. Dep. 139-40. Plaintiff testified that he does not know the age of any of his team members.[2] Pl. Dep. 142.

On February 26, 2021, Plaintiff had a conversation with Lee, during which he reminded Lee

---

[1] The deposition transcript references "Palmer." However, Defendant represents this is a transcription error and the correct last name is "Pomer."

[2] In 2021, Lee was forty-one years old, Dubis was thirty-three years old, Gunderson was sixty-eight years old, Pomer was forty-nine years old, and Lamb was sixty-two years old. Riggins Decl. ¶ 3 (ECF No. 47-5).

that it was only his 8th day on the floor and that he was still trying to learn and become more proficient and efficient. Pl. Aff. Dated April 10, 2023, p. 14. Lee stated that he understood but pushed Plaintiff that the panels needed to be completed in a timely manner and noted that Plaintiff was working too slowly. Pl. Aff. Dated April 10, 2023, p. 14. Mr. Lewis informed Lee that he would try to work faster and become more efficient. Pl. Aff. Dated April 10, 2023, p. 14.

From the start of his employment at the IRC, Lee felt Plaintiff did not meet production standards or keep up with the expected daily work output. Lee. Dep. 20. About a month into Plaintiff's employment at the IRC, Lee raised concerns about Plaintiff's productivity to Plaintiff. Pl. Dep. 164-65 . On March 18, 2021, Lee approached Plaintiff questioned him regarding his production work. Plaintiff reminded Lee of their previous conversation and the issues with learning. Lee informed Plaintiff that he was working too slowly. Plaintiff explained what he was working on and why it was taking as long as it was. The meeting ended with Lee asking what he could do to help Plaintiff and Plaintiff responded with having the experienced MT provide more hands-on instruction. Lee agreed. Pl. Dep. Ex. pp. 144-45.

In response, Plaintiff submitted a formal internal ethics complaint against Lee. Pl. Dep. 154-55; Pl. March 20, 2021, Ethics Complaint (ECF No. 47-6). Specifically, Plaintiff complained that, on February 26, 2021, Lee told Plaintiff to improve his production speed because it was not fair to the team if he was not doing his share of the work. Pl. March 20, 2021, Ethics Complaint p. 3. Then, in a meeting on March 18, 2021, Lee told Plaintiff he was taking too long to set up, not working at an effective production rate, and had poor quality, among other things. Pl. March 20, 2021, Ethics Complaint pp. 4-5.

Plaintiff admits Lee did not initiate any formal discipline as a result of these performance

discussions about his production. Pl. Dep. 162. However, Boeing's Corporate Investigations department investigated Plaintiff's March 20, 2021, complaint. Martin Dep. 16 (ECF No. 47-7). As part of this investigation, Plaintiff discussed his concerns about Lee with Boeing's Lead Investigator, Cheryl Harding on March 31, 2021, and Harding emailed Plaintiff a summary of their discussion. Pl. Dep. 175-76; Email Chain Between Harding and Pl. (ECF No. 47-8). In this summary, which Plaintiff read and acknowledged as accurate, Plaintiff concedes that Lee did not violate company policy. Pl. Dep. 176; Email Chain Between Harding and Pl.

Plaintiff submitted another internal ethics complaint on June 10, 2021, for a discussion in which Lee asked Plaintiff why he had not installed any inserts in panels before lunch. Pl. Dep. 206-07, 220-21; Pl. June 10, 2021, Ethics Complaint (ECF No. 47-9). During their discussion, Lee told Plaintiff he wanted him to succeed but that his work was not meeting expectations. Pl. Dep. 210; Pl. June 10, 2021, Ethics Complaint. Lee also reminded Plaintiff that all employees needed to pull their weight in terms of production and again asked Plaintiff what he could do to help him succeed. Pl. June 10, 2021, Ethics Complaint. Plaintiff avers that Lee yelled at him and berated him for wasting time. Plaintiff tried to explain to Lee that he finished the panel work he had and was assigned work in another area by Dubis. When he returned to his area, a new panel was there for him to work on. Pl. Dep. Ex. p. 159. Plaintiff admits he does not know what Boeing did to investigate his complaint about this meeting with Lee. Pl. Dep. 213-14. In fact, Boeing's Corporate Investigations department investigated this complaint, and Corporate Investigator Melinda Vasquez determined Lee's conversation with Plaintiff did not violate Boeing policy. Martin Dep. 17; Boeing Report of Investigation 888214 (ECF No. 47-10). Specifically, Vasquez concluded "Lee's conversation with [Plainitff] was within management level-setting expectations and is a common

business practice." Boeing Report of Investigation 888214 . Plaintiff did not allege any action was taken against him because of his age or to retaliate against him in either of these ethics complaints. Pl. March 20, 2021, Ethics Complaint; Pl. June 10, 2021, Ethics Complaint; Email Chain Between Harding and Pl.

Plaintiff also violated process during his employment at the IRC. Lee Dep. 19; Campbell Dep. 13 (ECF No. 47-11). For example, on April 27, 2021, Lee told Plaintiff not to use a dead blow hammer to hit inserts because it violated Boeing's process. Pl. Dep. 189. Plaintiff admitted he used a dead blow hammer on inserts "two or three times." Pl. Dep. 189. Plaintiff informed Lee that others were using the dead blow hammer, he did not realize it was a violation of the process, and he would never do it again. Pl. Aff. p. 11 (ECF No. 50-1). Lee admitted in his deposition that Plaintiff never used the dead blow hammer again after that discussion. Lee Dep. 16. Nevertheless, Lee reported to Boeing's Corporate Investigations department that he observed Plaintiff using a dead blow hammer. Lee Dep. 15; Akwari Dep. 16 (ECF No. 47-12). Boeing investigated this report and assigned the case to Corporate Investigator Vasquez. Akwari Dep. 16; Martin Dep. 13-14; Boeing Report of Investigation 888214 . During this investigation, Plaintiff admitted he never looked at the insert process documentation and took advantage of using the hammer simply because it was there. Boeing Report of Investigation 888214. Vasquez concluded Plaintiff failed to review and follow the insert process, which led to defective work and scrapped panels. Boeing Report of Investigation 888214.

Plaintiff does not deny using a dead blow hammer to hit inserts. Pl. Dep. 189. He does not deny that using a hammer violated process. Pl. Dep 100. Instead, he claims other people used them too. Pl. Dep. 100, 189-90; Boeing Report of Investigation 888214. Specifically, Plaintiff testified

that he observed Jack Lamb and Deano Pomer use a hammer. Pl. Dep. 189-90. However, Plaintiff has no idea if Lee addressed the allegations he made about Lamb and Pomer. Pl. Dep. 191. As for himself, Plaintiff admits he received no discipline for using a hammer. Pl. Dep. 191; Lee Dep. 15. After Plaintiff learned Lee reported his use of the hammer, he submitted a rebuttal document to Vasquez alleging Lee had singled him out. Pl. Dep. 193-95, 222; Plaintiff's May 22, 2021, Rebuttal Document (ECF No. 47-13). Plaintiff testified that he has no information regarding Boeing's investigation into this allegation. Pl. Dep. 204.

Boeing did investigate Plaintiff's complaint. Martin Dep. 16-17; Boeing Report of Investigation 888214. During that investigation, Corporate Investigator Vasquez interviewed Lee and Team Lead, Dubis[3], who both stated they had not witnessed others use a dead blow hammer to insert panels. Boeing Report of Investigation 888214 p. 3. Vasquez could not substantiate Plaintiff's allegation that others were using the dead blow hammer on inserts and determined there was no evidence to support Plaintiff's complaint that Lee had singled him out. Boeing Report of Investigation 888214 p. 3. Further, Vasquez determined Lee correctly reported Plaintiff for not following process during the insert application, which is consistent with Boeing's expectations of its managers. Boeing Report of Investigation 888214. As previously stated, Plaintiff did not complain of age discrimination, age harassment, or retaliation in this complaint. Plaintiff's May 22, 2021, Rebuttal Document ;Boeing Report of Investigation 888214 p. 3.

On June 8, 2021, Boeing conducted an internal documentation compliance audit at the IRC, during which six IRC employees, including Plaintiff, were audited. Boeing Report of Investigation

---

[3]Plaintiff does not allege Dubis ever treated him differently or retaliated against him based on his age. He testified that Dubis "treated [him] with respect . . . [and was] a very good lead." Pl. Dep. 198-99.

891633 (ECF No. 47-14).  During the audit, Plaintiff was asked about documentation for rework he was doing, and Plaintiff stated it was his practice not to stamp (document) his work until his work was completed.  Boeing Report of Investigation 891633 p. 4.  However, the rework Plaintiff performed required incremental documentation on an in-process correction (IPC) because he worked past the standard work life for the adhesive he used.  Boeing Report of Investigation 891633 p. 4. The auditor informed Plaintiff that performing this rework without an IPC was a process violation and told him to complete the necessary documentation.  Boeing Report of Investigation 891633 p. 4. Based on these findings, the Corporate Investigations department investigated Plaintiff's audit performance.  Martin Dep. 26-27;  Boeing Report of Investigation 891633.  After thorough review, Corporate Investigator Mickey Westphal substantiated the allegations that Plaintiff failed to document his work as he completed it, failed to document rework on an IPC, and worked outside the work life of the adhesive he used.  Boeing Report of Investigation 891633 p. 2.

Plaintiff was on medical leave from June 14, 2021, until July 26, 2021.  Pl. Aff. p. 14 (ECF No. 50-1).  On July 16, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging age discrimination and retaliation.  He received a right to sue notice on July 20, 2021.

When Plaintiff returned to work on July 27, 2021, he was informed that Andrew Housand would now be his manager.  Pl. Aff. p. 14 (ECF No. 50-1).  On July 30, 2021, Plaintiff was working on a large panel with two layers of inserts when Lee, who was no longer Plaintiff's supervisor, approached Plaintiff and informed him he was violating process by using tape, using his finger rather than approved tools to put in inserts, and using a dial indicator. Pl. Dep. 228-29, 230-33.  Plaintiff informed him that the way he was performing the task was the way he was taught.  Pl. Dep. 170-71.

-7-

The following day, Plaintiff submitted another written complaint to Ethics Advisor Bluer. Pl. Dep. 233-34; Pl. July 31, 2021, Ethics Complaint (ECF No. 47-15). Specifically, Plaintiff alleged that Lee "plainly and abruptly accused [him] of not following the process." Pl. July 31, 2021, Ethics Complaint p. 6. Plaintiff stated in the complaint that he felt Lee was out to terminate him and that the "barrage of accusations is unacceptable, unethical, and is creating a hostile work environment." Pl. July 31, 2021, Ethics Complaint p. 6.   Once again, Plaintiff does not know what Boeing did to investigate his complaint and has no idea whether Lee did anything beyond addressing Plaintiff's performance directly with him. Pl. Dep. 234-36.   Plaintiff was not disciplined or suspended as a result of these three process violations. Pl. Dep. 236.   On August 2, 2021, Plaintiff had a meeting with Senior Manager Nelson Akwari to discuss the incident.   Akwari informed Plaintiff that Lee's actions were unacceptable and agreed that they needed to stop.   Akwari stated that he did not think Plaintiff had violated the process, and assured Plaintiff he would discuss the issue with Lee when he returned from vacation.   Pl. Aff. p. 17 (ECF No. 50-1).

Boeing investigated Plaintiff's July 31, 2021, complaint.   Martin Dep. 17-18; Boeing Report of Investigation 894916 (ECF No. 47-16).   During the investigation, Vasquez found Plaintiff failed to follow the current published standard work process and used unauthorized tools during the final insert cure process. Boeing Report of Investigation 894916 p. 2. Moreover, Vasquez found Plaintiff "was unable to articulate how or why Lee's confrontation was improper other than [Plaintiff's] disagreement with Lee's understanding of the current process." Boeing Report of Investigation 894916 pp. 2-3.   After reviewing witness statements, which corroborated the business legitimacy of Lee's level-setting conversation with Plaintiff, Vasquez concluded Lee did not engage in any inappropriate communication; to the contrary, he exhibited behavior consistent with Boeing's

expectations for management. Boeing Report of Investigation 894916 p. 3. This complaint too was devoid of any allegation of age discrimination, age harassment, or retaliation.

During this same investigation, two employees on Plaintiff's team, Gunderson and Lamb, reported that Plaintiff was on Boeing property while he was supposed to be out of work on a leave of absence. Boeing Report of Investigation 894916 p. 3. As stated above, Plaintiff was approved for a medical leave of absence from June 14 through July 26, 2021. Pl. Dep. 205, 245; Boeing Report of Investigation 894916 p. 3. Vasquez reviewed gate access reports and computer logs, which confirmed Lewis was on Boeing property using Boeing computers on June 20 and 27, 2021, and again on July 5, 11, 18, 19, and 25, 2021. Boeing Report of Investigation 894916 p. 3. With limited exceptions, none of which are applicable here, employees are not allowed on company premises while on a leave of absence. Boeing Report of Investigation 894916 p. 3; Boeing Leave of Absence Policy at 11 (ECF No. 47-17). Plaintiff admits he came on Boeing property while on a leave of absence three times, and concedes that doing so indisputably violated company policy. Pl. Dep. 243-44. Based on Plaintiff's own admissions, witness statements, and computer records, Vasquez concluded her investigation on October 18, 2021, finding Lewis violated Boeing's leave of absence policy by coming on site without authorization in June and July 2021. Boeing Report of Investigation 894916 p. 4.

On August 13, 2021, Plaintiff's new manager became Illiana Vasquez. Pl. Aff. p. 17 (ECF No. 50-1). On August 25, 2021, Gunderson conducted a regular compliance walk of the area when she discovered Plaintiff's personal stamp and a pack of crackers unsecured in his work station. Campbell Dep. 13; Boeing's Report of Investigation 897434 p. 5 (ECF No. 47-18). Plaintiff admits he kept crackers in his work station and told Corporate Investigator Vasquez he knew food was

prohibited in his work station because it was a Foreign Object Debris (FOD) policy violation.  Pl.

Dep. 291; Boeing's Report of Investigation 897434 p. 5. While Plaintiff denied leaving his stamp

unsecured – claiming someone had taken it while he was on a leave of absence – he did not report

it missing as required and could not explain why it was found in his work station.  Boeing's Report

of Investigation 897434 p. 5.  Thus, Vasquez concluded Plaintiff violated Boeing's stamping and

FOD policies.  Boeing's Report of Investigation 897434 p. 6.

On August 31, 2021, and September 1, 2021, the FAA conducted an audit at the IRC.[4] Pl.

Dep. 247; Russell Dep. 27.  On day one of the audit, FAA Auditor Antwane Tate, accompanied by

two Boeing FAA liaisons, informed Plaintiff he would be audited.  Pl. Dep. 256-58.  Plaintiff gave

them the part numbers for the panels on which he was working and explained what work he would

be doing that day.  Pl. Dep. 258.  At that point, Plaintiff realized he had installed the inserts on the

wrong side of the panel, so he reworked the panels, applied potting adhesive on the insert, and left

for lunch.  Pl. Dep. 258. When Plaintiff returned from lunch, the FAA Auditor resumed his

observation of Plaintiff's work. Pl. Dep. 259. The standard work process says to wait twenty-five

minutes to detab the inserts, but Plaintiff told the FAA Auditor he found it better to wait forty-five

_____

[4]The FAA is an independent regulatory agency that oversees compliance with Boeing's
production certificate and ensures that Boeing adheres to its quality and reporting standards. Lee
Decl. ¶ 3 (ECF No. 47-19);  Russell Dep. 24-25 (ECF NO. 47-20); Pl. Dep. 247-48.  Boeing's
production certificate gives it the authority to manufacture the products listed in the certificate.
Russell Dep. 10. Without the production certificate, Boeing could not manufacture airplanes.  Pl.
Dep. 248. The FAA must audit facilities operating under Boeing's production certificate to
ensure compliance therewith. Russell Dep. 10, 26.  Accordingly, the FAA conducts random
audits and has full authority to decide what it wants to audit, and Boeing must grant the FAA
access to the areas or processes it wants to audit. Russell Dep. 9-10, 28-29. Simply put, FAA
audits are very important because that is how Boeing maintains its production certificate.  Russell
Dep. 26. Failure to adhere to the FAA's audit standards could result in civil penalties or, in a
worst-case scenario, loss of Boeing's production certificate. Russell Dep. 26-27.

minutes.  Pl. Dep. 261.

On the second day of the audit, the FAA Auditor returned to observe Plaintiff, accompanied by one liaison from the previous day and a new liaison Plaintiff did not know. Pl. Dep. 263-64. Plaintiff filled voids in his inserts by extruding potting compound onto a tube cap and dabbing it onto the holes with a Q-tip. Pl. Dep. 267-69. The auditor asked Plaintiff about an IPC to document the rework and Plaintiff claimed one was not required.  Pl. Dep. 269. When the FAA Auditor noticed Plaintiff had performed rework without documenting it, he reviewed the work specifications and determined that Plaintiff had improperly performed unauthorized rework in violation of process. Russell Dep. 15. After Plaintiff finished the process with the Q-tip, he finished or "bought off" his work and the audit ended.  Pl. Dep. 274.

Plaintiff's panels were then taken to the Material Review Board for observation.  Pl. Dep 274-75.  There, Plaintiff was informed by Nelson Akwari that he had violated process because he used unauthorized tools – a Q-tip instead of a syringe and needle set – and failed to perform an IPC to document the rework he performed.  Pl. Dep. 277-78.  Akwari informed Plaintiff that he was not allowed to perform production work until the investigation was completed. Pl. Dep. Ex. p. 192 (ECF No. 50-6).  Plaintiff provided Akwari a 42-page explanation regarding this alleged violation before he left for the day.  Pl. Dep. Ex. p. 192.  The following day, Akwari informed Plaintiff he was being suspended pending an investigation into the process violations he committed during the FAA audit. Pl. Dep. 280-81.

As a result of Plaintiff's actions during the FAA audit, the FAA issued Boeing a Formal Compliance Action Request (FCAR), which explained the noncompliance and directed Boeing to investigate the matter. Russell Dep. 15, 30;  FAA's September 7, 2021, Letter to Boeing (ECF No.

47-21).  In its letter, the FAA stated its auditor observed Plaintiff improperly fill insert voids using an unidentified potting compound from a tube cap with a Q-tip and performing undocumented rework.  FAA's September 7, 2021, Letter to Boeing p. 2.  The FAA directed Boeing to investigate the noncompliance and respond with immediate corrective action, an analysis of the cause of the noncompliance, and a proposed long-term corrective action response. FAA's September 7, 2021, Letter to Boeing p. 2.  Accordingly, Boeing opened an internal investigation into the FAA's audit findings.  Russell Dep. 16; Campbell Dep. 13; Boeing's Report of Investigation 897434. Boeing's investigation concluded that Plaintiff used unauthorized tools and failed to follow the documentation process for rework performed due to voids in inserts according to written process or specifications, which resulted in Boeing being issued a FCAR by the FAA. Boeing's Report of Investigation 897434 p. 2. Specifically, Vasquez determined that Plaintiff did not follow the process for cure time, did not measure the potting compound, failed to document rework, and used a tube cap and Q-tip—tools not authorized for use during the insert process application. Boeing's Report of Investigation 897434 p. 2.

This investigation, along with the numerous other substantiated investigations into Plaintiff's performance, were submitted to Boeing's Employee Corrective Action Review Board (ECARB). Campbell Dep 15.  The ECARB reviewed investigations into each violation and the investigators presented their findings.  Campbell Dep. 16.  Several policy violations were highlighted during the ECARB's review of these investigations including: (1) Plaintiff used a dead blow hammer to perform insert work in violation of process; (2) Plaintiff used unauthorized tools during the FAA audit; (3) Plaintiff's stamp was unsecured and his food was found in an area that violated policy; (4) Plaintiff worked outside the life of the adhesive; (5) Plaintiff did not follow proper rework

procedures; and (6) Plaintiff violated Boeing's leave of absence policy. Campbell Dep. 13. After reviewing these investigations, the ECARB determined discharge was appropriate. Akwari Dep. 20; Campbell Dep. 15-16. Plaintiff was issued a corrective action memo terminating his employment on November 3, 2021. Pl. Corrective Action Memorandum for Discharge (ECF No. 47-22).

Plaintiff filed a second Charge of Discrimination with the EEOC on January 5, 2022, alleging retaliation, age discrimination, and hostile work environment. He received a right to sue notice on September 28, 2022. Plaintiff filed the present action on October 3, 2022.

## III.     STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory

allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.     DISCUSSION

### A.     Discrimination

Plaintiff alleges that Defendant disciplined him and terminated his employment based upon his age in violation of the ADEA.  The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1).

The Fourth Circuit has held that the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to claims under

-14-

the ADEA.[5]  Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  To establish a prima facie case in the specific context of a discriminatory discharge claim when disparate discipline is alleged, a plaintiff must show that: "(1) he was a member of a protected class; (2) he was satisfactorily performing his job at the time of the termination; (3) he was terminated from his employment; and (4) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of other employees outside the protected class who received less severe discipline." Haynes v. Waste Connections, Inc., 922 F.3d 219, 223 (4th Cir. 2019) (citing Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011)); see also Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002).  The fourth prong of an age-discrimination case may be satisfied by establishing "circumstances that give rise to an inference of unlawful discrimination." Denis v. Horry Cnty. Police Dep't, No. 4:20-CV-3849-JD-TER, 2022 WL 4181042, at *6 (D.S.C. June 28, 2022), (citing Gurganus v. Beneficial, N.C., Inc., 25 F. App'x 110, 111 (4th Cir. 2001), report and recommendation adopted, 2022 WL 3357883 (D.S.C. Aug. 15, 2022)).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment.  Texas Dept. of Community Affairs

---

[5]The Supreme Court has noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., 557 U.S. 167, 175 n.2, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the Fourth Circuit precedent has consistently applied the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 386 Fed.Appx. 411, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework to ADEA claims following the Gross opinion); Loose v. CSRA Inc., No. 19-2394, 2021 WL 4452432, at *2 (4th Cir. Sept. 29, 2021) (continuing to apply the McDonnell Douglas framework to ADEA claims).

v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143.

To avoid dismissal, Plaintiff's ADEA discrimination claim must be supported by evidence from which the Court may plausibly infer he would not have experienced such treatment "but for" his age. See Gross, 557 U.S. at 176 (holding age claims of disparate treatment "cannot succeed unless the employee's protected trait . . . had a determinative influence on the outcome," or, in other words, "that age was the 'but-for' cause of the employer's adverse decision."); Cole v. Fam. Dollar Stores of Maryland, Inc., 811 Fed. App'x 168, 172 (4th Cir. 2020) (addressing retaliation claim under the ADEA and relying on Gross and Foster v.Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015) to conclude retaliation must be "the 'but-for' cause of the challenged employer decision.").

As an initial matter, although Plaintiff's job performance was discussed with him several times by Lee, both parties agree that Plaintiff never received any discipline for his process violations prior to his suspension and subsequent termination following the FAA audit. Thus, the only adverse employment action at issue here is Plaintiff's termination. As discussed below, while both parties in this case provide lengthy discussions regarding Plaintiff's job performance and disagree about

whether Plaintiff was performing his duties incorrectly, Plaintiff's discrimination claim ultimately fails because he has failed to show that his termination was because of his age. His discrimination claim does not move beyond the prima facie stage of analysis because Plaintiff has produced insufficient evidence that other, substantially younger employees engaged in similar conduct but were not terminated for it.

Based upon the evidence presented by both parties, whenever Lee discussed a performance issue with Plaintiff, Plaintiff's usual response was that other employees performed the task at issue the same way he did. However, the only time he specifically identifies other employees that performed tasks the same way was when Lee told him not to use the dead blow hammer. Plaintiff testified that be observed two other maintenance technicians, Lamb and Prosser, use a dead blow hammer during the insert process. Pl. Dep. 189-90. Nevertheless, as stated above, it is undisputed that Plaintiff received no discipline for his use of the hammer, and Lee's discussion with him about it had no impact on his job duties or pay. Pl. Dep. 191. Thus, it is not actionable as an adverse employment action.

With respect to his termination, Plaintiff is unable to point to any employee outside his protected class who was retained after using unauthorized tools and failing to document rework performed during a FAA audit. He admits that he is unaware of anyone else who committed the same process violations. Pl. Dep. 305. As stated above, a plaintiff is not required to identify a similarly situated comparator to prove his discrimination claim, so long as he can establish an inference of unlawful discrimination through other means. Swaso v. Onslow Cnty. Bd. of Educ., 698 F. App'x 745, 748 (4th Cir. 2017), as amended (Aug. 11, 2017) (citing Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545-46 (4th Cir. 2003)). However, other than his own speculation,

Plaintiff does not offer any other evidence or circumstances that would give rise to an inference of discrimination under the fourth prong of the prima facie case. Because Plaintiff has failed to present sufficient evidence to establish a prima facie case of discrimination under the ADEA, summary judgment is appropriate on his age discrimination cause of action.

**B.     Retaliation**

Plaintiff also alleges a cause of action for retaliation. The ADEA prohibits employers from discriminating against an employee who "has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). The same burden-shifting proof scheme discussed above applies to retaliation claims. To establish a prima facie case of retaliation, the plaintiff must show (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) there was a causal connection between the protected activity and the asserted adverse action. Smith v. CSRA, 12 F.4th 396, 416 (4th Cir. 2021); Strothers v. City of Laurel, Maryland, 895 F.3d 317, 327 (4th Cir. 2018). A plaintiff may engage in protected activity by opposing an employment activity that was "actually unlawful under" the relevant discrimination statute or that the plaintiff reasonably believed was unlawful under the relevant discrimination statute. Boyer–Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397 (4th Cir. 2005)).

Though Plaintiff made numerous internal complaints about unfair treatment, none of those complaints mention Plaintiff's age as the reason he believed he was being treated unfairly. He makes vague references to discrimination and harassment but does not connect this treatment to his age. Complaints about management activities that would not constitute unlawful discrimination do not

count as protected activity. See Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216–17 (4th Cir. 2002); see also Buchhagen v. ICF Int'l, Inc., 650 F. App'x 824, 829 (4th Cir. 2016) (explaining that the court is hard pressed to find protected activity where the plaintiff's complaints were largely silent about age and were instead directed at what the plaintiff considered harassment or other unfair treatment by her employer). Therefore, Plaintiff's many internal complaints are not protected activity and do not give rise to a retaliation claim.

Though Plaintiff makes no mention of this in his response, Defendant notes that Sandra Martin, the Lead Investigator for Corporate Investigations, testified that Plaintiff mentioned his age being a factor during her investigation into the report that Plaintiff had violated stamping and FOD policies. Martin Dep. 29. At the time Plaintiff made the remark, he believed that Lee had reported the violations, but they were actually reported by Gunderson, who Martin noted was of a similar age to Plaintiff. Martin Dep. 29. There is no record of that complaint in the report following that investigation. Boeing's Report of Investigation 897434". Nevertheless, this oral statement from Plaintiff that he believed his age was a factor, even if he was incorrect, is still protected activity. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (holding that a person engages in a protected activity by reporting unlawful discrimination that he reasonably believed had occurred or was occurring); Strothers v. City of Laurel, 895 F.3d 317, 328 (4th Cir. 2018) (noting that protected activity may include informal oral or written complaints of discrimination to the employer).

Defendant does not dispute that Plaintiff's EEOC Charge of Discrimination filed on July 16, 2021, constitutes protected activity. Further, his termination is clearly an adverse action. However, Defendant argues that Plaintiff fails to show a causal connection between his EEOC Charge and his

termination. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark County School District. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted). A " 'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action' " often " 'negates any inference that a causal connection exists between the two.' " Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) (citation omitted).

As an initial matter, the Fourth Circuit has "consistently required proof of a decisionmaker's knowledge of protected activity to support a [ ] retaliation claim." Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 124 (4th Cir. 2021) (clarifying that the decisionmaker must have actual, not constructive, knowledge of the protected activity). To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred. Baqir v. Principi, 434 F.3d 733, 748 (4th Cir. 2006); see also Johnson v. United Parcel Serv., Inc., 839 Fed.Appx. 781, 783-84 (4th Cir. 2021)(citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)(plaintiff cannot establish the causation element of her prima facie case where the relevant decisionmaker was unaware of her protected activity)). In the present case, the decision to terminate Plaintiff's employment was made by the ECARB. The ECARB is a neutral decision-making body

tasked with reviewing substantiated internal investigations, identifying violations of Defendant's policy, and determining the appropriate level of corrective action to apply on a case-by-case basis. Riggins Decl. ¶ 7 (ECF No. 47-5); Campbell Dep. 15:21-24. Plaintiff has produced no evidence to suggest that any ECARB member who decided to terminate his employment was aware of his EEOC Charge. The same is true with respect to Plaintiff's statement mentioning his age during the investigation into the report that Plaintiff had violated stamping and FOD policies.[6] Plaintiff does not know who was on the ECARB, or what factors were considered in the decision to terminate his employment. Pl. Dep. 298-99. Absent proof of the decisionmaker's knowledge of Plaintiff's protected activity, his retaliation claim fails.

Further, even if the ECARB members did have knowledge of Plaintiff's EEOC Charge, too much time elapsed between the time of the EEOC Charge and his termination to show a causal connection between the two. Plaintiff filed his first EEOC Charge on July 16, 2021. He was terminated on November 3, 2021. The Fourth Circuit has held that a temporal lapse of even two months is too long without other retaliatory acts in the interim to support an inference of causation. See Laurent-Workman v. Wormuth, 54 F.4th 201, 219 (4th Cir. 2022) ("[A] two-month temporal gap ... is sufficiently long so as to weaken significantly the inference of causation." (internal quotation marks and citation omitted)); Horne v. Reznick Fedder & Silverman, 154 F. App'x 361, 364 (4th Cir. 2005) (lapse of two months is "sufficiently long so as to weaken significantly the inference of causation"); see also Gaines v. Balt. Police Dep't, 657 F. Supp. 3d 708, 745 (D. Md. 2023) (noting that a lapse of time as little as two months between the protected activity and an adverse employment action is sufficiently long so as to weaken significantly the inference of

---

[6]As stated above, Plaintiff's comment that he thought his age was a factor in the said investigation was not included in the report resulting from that investigation.

-21-

causation); <u>Hamada v. Boeing Co.</u>, C.A. 2<u>Hamada v. Boeing Co.</u>, C.A. 2:19-02777-DCN-MGB, 2021 WL 4398456, *7 (D.S.C. Sept. 27, 2021) (holding "temporal proximity on the basis of one to two months between protected activity and adverse action is not alone sufficient to prove causation"). Here, almost four months passed between Plaintiff's EEOC charge and his termination.[7] Thus, for this reason as well, Plaintiff fails to present sufficient evidence to establish a casual connection between his protected activity and his adverse action. As such, his retaliation claim fails.[8]

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (ECF No. 47) be granted and this case be dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 15, 2024
Florence, South Carolina

**The parties are directed to the important information on the attached page.**

---

[7]Further, between the time of Plaintiff's EEOC charge and his termination, the FAA audit was conducted and additional noncompliance by Plaintiff was discovered.

[8]Plaintiff does not raise a separate cause of action for hostile work environment, but mentions it within his retaliation cause of action. Nevertheless, any such claim fails for the same reason as his discrimination and retaliation claims fail–there is insufficient evidence in the record that any of Plaintiff's treatment was the result of his age. <u>See</u> Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Causey v. Balog</u>, 162 F.3d 795, 801 (4th Cir.1998)) ("To state a hostile work environment claim, [a plaintiff] must allege that: (1) [he] experienced unwelcome harassment; (2) the harassment was based on [his] gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.").